## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

LOIS P. MORRIS,

        Plaintiff,

vs.                                Case No. 3:06-cv-854-J-MCR

MICHAEL J. ASTRUE[1],
Commissioner of the Social
Security Administration,

        Defendant.

_____/

### REPORT AND RECOMMENDATION[2]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for Social Security benefits for the time period from November 1, 1998 through March 31, 2000. The Court has thoroughly reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, it is recommended the Commissioner's decision be **AFFIRMED**.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits ("DIB") on March 4, 2002, alleging an inability to work since November 1, 1998.

---

[1] Michael J. Astrue became the Commissioner of Social Security Administration on February 1, 2007.  In accordance with Fed. R. Civ. P. 25(d)(1), Michael J. Astrue should be substituted as Defendant in this litigation.

[2] Specific written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

(Tr. 54, 59).  The Social Security Administration ("SSA") denied this application initially and on reconsideration. (Tr. 38-40, 42-44).  Plaintiff then requested and received a hearing before an Administrative Law Judge (the "ALJ") on January 27, 2004.  (Tr. 45-50, 365-383).  On April 9, 2004, the ALJ issued a decision concluding that Plaintiff is not disabled within the meaning of the Social Security Act.  (Tr. 16-24).  Plaintiff filed a Request for Review by the Appeals Council, and on July 28, 2006, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. 5-7).  Plaintiff timely filed her Complaint in the U.S. District Court on September 27, 2006.  (Doc. 1).

## II.   NATURE OF DISABILITY CLAIM

### A.   Basis of Claimed Disability

Plaintiff claims to be disabled since November 1, 1998, due to heart problems, high blood pressure, a hernia, high cholesterol, and arthritis in her back, hips and hands.   (Tr. 54, 59).

### B.   Summary of Evidence Before the ALJ

Plaintiff was 52 years of age at the time her insured status expired on March 31, 2000.  (Tr. 24).  She has her General Educational Developmental (GED) diploma and past work experience as a waitress, cashier, restaurant manager, driver, cook, sales person, plant nursery worker, and security guard.  (Tr. 60, 72, 373).  Plaintiff's medical history is set forth in the ALJ's decision and the briefs.  By way of summary,[3] Plaintiff was admitted to Shands HealthCare ("Shands") on September 11, 1996 for severe

---

[3] This summary is limited to the evidence relevant to the issues on appeal.

burns after she removed the cap on her vehicle's radiator while the engine was still hot. (Tr. 99). She was diagnosed with 22% total body surface area scald burns to her back, right arm, right shoulder, and right breast. Id. Plaintiff also had a history of angina.[4] Id. Plaintiff underwent several operations during her hospital stay. On September 13, 1996, she underwent a debridement and grafting of burn of right arm, right shoulder, and right areola. Id. On September 26, 1996, Plaintiff had a left heart catheterization. Id. Then, on September 27, 1996, she underwent another debridement and grafting of burns of the right areola, back, and nape of neck. Id.

Plaintiff's heart catheterization showed she had osteal lesions at the circumflex and left anterior descending coronary arteries, which produced approximately 40% stenosis. (Tr. 102). There was a second lesion at the mid LAD which caused 40% obstruction, and her ejection at the time of cauterization was approximately 65%. Id. However, no myocardial ischemia or severe coronary artery disease was identified. Id. Plaintiff was discharged on October 2, 1996, in good condition. Id. She was asked to follow up with the burn clinic on October 10, 1996 (Tr. 103); however, the record does not contain any follow-up records with the burn clinic.

On July 30, 1998, Plaintiff underwent another left heart catheterization and a selective coronary and left ventricular angiography at Shands. (Tr. 112-114). The coronary angiography demonstrated: the mid-section of Plaintiff's anatomically dominant right coronary artery had 60-70% obstruction; the proximal section of the left

---

[4] Angina, or chest pain, is a common symptom of coronary artery disease. See WebMd, www.webmd.com/heart-disease/guide/heart-disease-angina (Last visited on February 26, 2007).

3

anterior descending branch of the left coronary artery had 30% obstruction; and the first obtuse marginal branch of the left coronary artery had 40-50% obstruction.  (Tr. 113). Juan M. Aranda, Jr., MD interpreted the tests and concluded Plaintiff had: moderate left ventricular hemodynamic dysfunction; normal left ventricular wall motion; coronary artery disease, severe, involving the mid-section of the anatomically dominant right coronary artery; coronary artery disease, moderate, involving the first obtuse marginal branch of the left coronary artery; and coronary artery disease, mild, involving the proximal section of the left anterior descending branch of the left coronary artery.  Id.

On January 9, 1999, Plaintiff was again admitted to Shands for chest pain and to rule out myocardial infarction.  (Tr. 115).  She underwent a third left heart catheterization with coronary angiogram on January 11, 1999.  (Tr. 116).  The angiogram revealed significant progression of the disease as compared to the previous 1998 study.  Id.  It showed a 70% ostial narrowing of the first obtuse marginal, as well as a 38% stenosis of the proximal left anterior descending branch.  Id.  Plaintiff was discharged from Shands on January 13, 1999 in stable condition.  Id.  On discharge, it was noted that Plaintiff should follow a low cholesterol, low fat cardiac diet but that Plaintiff had no activity restrictions.  Id.  She was discharged with medical treatment prescriptions of a beta blocker and long-acting nitrates and was given vitamin E, folic acid, and thiamine for preventative treatment.  Id.   Plaintiff was told to make a follow-up appointment with Dr. Pepine at Shands.  Id.

On May 8, 2000, Plaintiff underwent a carotid duplex scan which showed moderate bilateral carotid bifurcation plaquing with no hemodynamically significant abnormality noted.  (Tr. 138).

4

On April 16, 2001, Plaintiff was admitted to Shands again, this time for chest and head pain after falling in her yard and landing on her chest. (Tr. 140). On admittance, Judy Mayor-Davies, M.D., noted that Plaintiff has a history of ischemic heart disease, two stents, hypertension, and elevated cholesterol – all for which she was already being treated. (Tr. 143). She underwent a CT scan of the head which was negative. Id. A chest X-ray showed mild obstructive airways disease, but no acute cardiopulmonary abnormalities. (Tr. 148). She was diagnosed with chest wall pain, hyponatremia, hypertension, increased cholesterol, and chronic ischemic heart disease. Plaintiff was discharged from Shands on April 18, 2001. Id.

On July 3, 2001, Plaintiff was admitted to Shands again for substernal left-sided chest pain radiating into her left breast and left arm. (Tr. 158-162, 169). Doroteo C. Audije, M.D., Plaintiff's attending physician, noted Plaintiff had undergone several cardiac catheterizations. (Tr. 161). After examining Plaintiff, Dr. Audije assessed her as having: chest pain; history of coronary artery disease; status post stent placement; history of hypertension; GERD; and hypercholesterolemia. (Tr. 162). Plaintiff was admitted to the intensive care unit ("ICU") for mild chest tightness and was given pain medications. Id. Plaintiff underwent an ECG that same night which showed borderline first degree AV block and probable early repolarization pattern. (Tr. 168). Two days later, on July 5, 2001, Plaintiff was referred and admitted to St. Vincent's for a cardiac catheterization. (Tr. 175). She was assessed as having a history of coronary artery stenting with recent symptoms of chest pain. Id. On July 6, 2001, Plaintiff underwent another cardiac catheterization and angiography, which showed her coronary disease had progressed. The angiography demonstrated:

5

the ostial portion of the left anterior descending artery had a 60-70%
stenosis present.  The ostium of the circumflex had a 70-75% stenosis
present.  The previously placed stent in the right coronary artery looked
good.  Ventricular function [was] normal.  The left internal mammary was
normal.

(Tr. 177).  Upon interpreting the angiography, Ernest P. Phillips, M.D. opined Plaintiff

had some coronary disease, but she was negative for ischemia.[5]  Id.  He treated Plaintiff

with medicines and noted if her symptoms persist, she may require coronary artery

bypass grafting.  Id.

Plaintiff returned to St. Vincent's on August 20, 2001, after experiencing multiple

episodes of syncope.  (Tr. 180).  J. Timothy Walsh, M.D., Plaintiff's admitting physician,

noted Plaintiff had a history of moderate coronary artery disease, hypertension,

hyperlipidemia, and diffuse noncritical coronary artery disease.  Id.  She was admitted

for electrophysiologic testing and tilt testing on September 4, 2001 in an effort to define

the mechanism of syncope. Id.   The testing showed Plaintiff suffered from: 1) syncope

with uncertain etiology, suspected to be due to sick sinus syndrome with a tachy-brady

variant; 2) sick sinus syndrome; and 3) coronary artery disease with a history of stent

placement to the right coronary artery on May 2000 and more recently, 60-70% osteal

stenosis of the LAD, 70-75% stenosis of the osteal circumflex, widely patent right

coronary stent, and normal left ventricular function.  (Tr. 184).

Based on the electrophysiologic testing, the absence of other definable causes

off arrhythmia, and the borderline abnormalities of sinus node and AV node, Plaintiff

_____

[5] Ischemia occurs when there is not enough blood flow to the heart muscle.  See
WebMD.com, www.webmd.com/heart-disease/guide/stress-test%20%20(dupe) (last visited on
February 27, 2008).

6

underwent surgery to receive a pacemaker and reported she felt better almost immediately.  (Tr. 186).  Dr. Walsh, however, expressed concern with Plaintiff's potential for myocardial ischemia.  (Tr. 186).  Dr. Walsh consulted with Dr. George Pilcher, an interventional cardiologist, and they concluded that despite mild to moderate ischemia, Plaintiff would be best served by managing her condition with medication.  Id.  Dr. Walsh noted that a bypass grafting surgery would place her at an increased risk because of her unabated cigarette use and her obstructive pulmonary disease.  Id. Plaintiff was discharged on September 7, 2001, in no distress with medications and was told to follow up with her doctors.  Id.  Dr. Walsh noted her long-term prognosis is somewhat guarded, but he opined she had a somewhat improved diagnoses for the short-term.  (Tr. 187).

On June 3, 2002, Plaintiff was admitted to St. Vincent's for unstable recurrent angina.  (Tr. 257).  Carlos A. Leon, M.D. evaluated Plaintiff and recommended she undergo bypass surgery due to progression of her ostial disease.  Id.  Plaintiff underwent the surgery and tolerated it without complications.  (Tr. 254).  She improved slowly and was discharged on June 13, 2002.  (Tr. 255).  She was instructed to increase activity as tolerated and not to engage in any driving or lifting of objects heavier than ten pounds for approximately three weeks.  Id.

Plaintiff followed up with Derek Muehrcke, M.D., on July 5, 2002, at which time a Doppler ultrasound indicated Plaintiff likely had 50-80% internal carotid artery stenosis. (Tr. 285).   Thus, on July 16, 2002, Plaintiff was admitted to St. Vincent's and underwent a carotid angiogram which revealed 50-60% internal carotid artery stenosis.  (Tr. 305). On July 17, 2002, Plaintiff underwent a right carotid endarterectomy with patch

angioplasty without complications.  Id.  Plaintiff was discharged on July 19, 2002 in

good condition.  Id.[6]

On June 1, 2002, the Division of Disability Determinations sent a letter to Dr.

Angelito Tecson for the purpose of obtaining information about Plaintiff's heart

condition.  (Tr. 317).  Dr. Tecson responded, noting that he last treated Plaintiff in May

of 2002 and that Plaintiff had no difficulty in her ability to function (i.e., sit, stand, walk,

lift, carry, travel, and socially interact).  Id.

On October 29, 2002, a state agency consultant considered Plaintiff's medical

impairments and opined that there was insufficient evidence, at the time of Plaintiff's

date last insured, to determine whether she had any limitations.  (Tr. 323).  On February

19, 2003, a second state agency consultant also determined there was insufficient

evidence as of Plaintiff's last insured date to conclude that she had any limitations.  (Tr.

338).  Additionally, on February 5, 2002, T. Wayne Conger, Ph.D., attempted to

complete a psychiatric review technique form, but he also determined there was

insufficient evidence to determine whether Plaintiff had any mental limitations which

would affect her ability to work.  (Tr. 324-336).[7]

**C.**   **Summary of the ALJ's Decision**

The ALJ determined that Plaintiff met the nondisability requirements of the Act

---

[6]  There are also records from the North Florida Mental Health Center showing Plaintiff
was treated for possible alcohol abuse; however, the Court elects to not summarize these records
as they are insignificant to this appeal and to Plaintiff's allegations of her disability in general.

[7]  The record also contains medical records of Plaintiff from Tecson Family Practice from
May 1, 2002 through January 8, 2004.  The Court, however, need not summarize these records as
there is nothing of significant relevance in them for purposes of this appeal.

and was insured for benefits through March 31, 2000.  (Tr. 16, 23).  At step one, the

ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged

onset date.  (Tr. 17, 23).  At step two, the ALJ found Plaintiff's burn residuals "severe"

based on the requirements in 20 C.F.R. § 404.1520(c).  (Tr. 20, 23).  The ALJ further

found that Plaintiff failed to offer any clinical evidence of arthritis, hernia, or kidney

damage (Tr. 20), and that "although she underwent cardiac catheterizations in 1996 and

1999, there was no clinical evidence that she had follow-up treatment" and her activities

were never restricted.  (Tr. 20).

At step three, the ALJ concluded that "[n]one of these impairments have been

supported by objective signs, symptoms, or laboratory findings and no more than

minimally affected her ability to perform work related activities during the period in

issue."  (Tr. 21) (citing Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).   Next,

the ALJ determined Plaintiff retained the residual functional capacity ("RFC") for a

significant range of light work.  (Tr. 21).  Specifically, she found Plaintiff was able to:

> lift and carry up to twenty pounds occasionally and ten pounds frequently.
> She was able to stand, walk, and sit for six hours in an eight-hour
> workday.  She was able to perform simple work functions.  She was not to
> be exposed to heat or cold and she was not to bet exposed to fumes.  She
> could occasionally bend and she could use one hand for helping.

(Tr. 21, 23).

At step four, based on Plaintiff's RFC, the ALJ determined Plaintiff was not able

to return to her past relevant work.  (Tr. 21, 23).  At step five, the ALJ called in a

vocational expert ("VE") to help determine whether there are a significant number of

jobs in the national economy that Plaintiff can perform given her RFC and other

vocational factors.  The VE testified that Plaintiff was capable of working as a survey

worker, an information clerk, and an office helper.  (Tr. 22).  Thus, the ALJ concluded

Plaintiff retained the capacity for work that exists in significant numbers in the national

economy and was not under a disability as defined by the Social Security Act.  (Tr. 23-

24).

## III.    STANDARDS OF LAW

### A.    <u>The Standard of Review</u>

The scope of this Court's review is limited to determining whether the ALJ

applied the correct legal standards, <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1080 (11th Cir.

1988), and whether the findings are supported by substantial evidence.  <u>Richardson v.</u>

<u>Perales</u>, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact

are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial

evidence is more than a scintilla – i.e., the evidence must do more than merely create a

suspicion of the existence of a fact, and must include such relevant evidence as a

reasonable person would accept as adequate to support the conclusion.  <u>Foote v.</u>

<u>Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995), <u>citing</u> <u>Walden v. Schweiker</u>, 672 F.2d 835,

838 (11th Cir. 1982) and <u>Richardson</u>, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.  <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991);

<u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view

the evidence as a whole, taking into account evidence favorable as well as unfavorable

to the decision.  <u>Foote</u>, 67 F.3d at 1560; <u>accord</u>, <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837

(11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**B.**   **The Five Step Evaluation**

A plaintiff is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

IV.    ANALYSIS

Plaintiff argues two issues on appeal.  First, Plaintiff asserts that the ALJ erred by failing to find Plaintiff's cardiac impairment "severe" at step 2 of the sequential evaluation.  Plaintiff's second argument piggybacks off her first argument.  She argues that because the ALJ erred in not considering Plaintiff's cardiac impairment as a severe impairment, the ALJ also erred by not considering her impairments in combination.

A.    **Whether the ALJ erred in determining Plaintiff's cardiac impairment was not severe?**

Plaintiff argues the ALJ erred in determining that the evidence failed to establish Plaintiff had a severe cardiovascular impairment.  (Doc. 13, p. 10).  This argument implicates the ALJ's determination at step two of the five-step evaluation process.  At step two, the ALJ is called upon to determine whether a claimant's impairments are severe.  By definition, this is a "threshold inquiry."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).  In Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984), the Eleventh Circuit held that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  Brady, 724 F.2d at 920.

As the McDaniel court noted, the analysis at step two "allows only claims based on the most trivial impairments to be rejected."  McDaniel, 800 F.2d at 1031.  "Claimant need show only that her impairment is not so slight and its effect is not so minimal."  McDaniel, 800 F.2d at 1031.  However, the Eleventh Circuit has elaborated by noting: "'severity' of a medically ascertained disability must be measured in terms of its effect

upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); see also 20 C.F.R. § 404.1521(a) (2003) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

The Court finds that Plaintiff suffered from coronary artery disease; however, there is no evidence whatsoever in the record which demonstrates her disease would significantly limit her ability to do basic work activities.  Rather, the record shows that Plaintiff's doctors placed no restrictions on her activities, with the exception of one doctor who instructed her to increase activity as tolerated and not to engage in any driving or lifting of objects heavier than ten pounds for approximately three weeks after she underwent bypass surgery on June 13, 2002.  Notably, Plaintiff's date last insured was March 31, 2000 and there is no evidence that Plaintiff's heart condition prevented her from working at that time.  In fact, even when Plaintiff's most recent records are considered, the evidence demonstrates Plaintiff is still capable of working in light jobs, as she has been discharged from each hospital visit with no major restrictions on her activities.  Consequently, the ALJ did not err when she deemed Plaintiff's heart condition not severe.[8]

Plaintiff also briefly mentions that she appears to meet Listing 4.04(C) –

---

[8] The ALJ summarized the evidence of Plaintiff's heart condition before her date last insured; however, she did not include Plaintiff's history from her most recent hospital visits and operations.  Nevertheless, the ALJ's decision should be upheld because at the time of Plaintiff's date last insured, there was insufficient evidence to show Plaintiff suffered from a severe cardiovascular impairment.

Coronary Artery Disease.  (Doc. 13, p. 12).  The evidence of record, however, demonstrates Plaintiff did not and does not meet this Listing.  Specifically, in order to meet Listing 4.04(C), Plaintiff must demonstrate that she suffers from coronary artery disease with two additional specific findings.  First, Plaintiff must offer angiographic evidence showing she has:

a.    50 percent or more narrowing of a non bypassed left main coronary artery; or

b.    70 percent or more narrowing of another non bypassed coronary artery; or

c.    50 percent or more narrowing involving a long (greater than 1 cm) segment of a non bypassed coronary artery; or

d.    50 percent or more narrowing of at least two non bypassed coronary arteries; or

e.    70 percent or more narrowing of a bypass graft vessel.

20 CFR Part 404, Subpt. P, App. 1, 4.04(C)(1)(a-e).  Although the records demonstrate Plaintiff suffered from various degrees of coronary artery disease, there is no evidence in the record that Plaintiff met any of these findings.  The medical tests performed on Plaintiff demonstrate that her arteries were not has narrow as that required by Listing 4.04(C) on or before her date last insured.  Moreover, even after her date last insured and after Plaintiff underwent bypass surgery in 2002, the evidence shows that Plaintiff still does not fit the first set of requirements of Listing 4.04(C).

Second, to meet Listing 4.04(C), Plaintiff must also show that her arterial disease results in "very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living."  20 CFR § 404, Subpt. P, App. 1, 4.04(C).  As this Court explained supra, there is no evidence that Plaintiff's coronary artery disease

limited her from activities.  Moreover, Plaintiff's testimony at her hearing and the evidence she submitted to the SSA demonstrated that Plaintiff was capable of performing various daily activities such as washing small loads of laundry and doing some grocery shopping, yard work, and housecleaning.  (Tr. 85-88,375-377). Accordingly, the ALJ did not err by not finding that Plaintiff met the Listing for coronary artery disease – 4.04(C).

> **B.**     **Whether the ALJ erred by not considering Plaintiff's impairments in combination**?

Plaintiff next argues that the ALJ erred in not finding Plaintiff's cardiovascular condition severe and thus, the ALJ failed by not considering Plaintiff's impairments in combination.  (Doc. 13, p. 16).  Because the ALJ did not err by finding that Plaintiff's coronary artery disease was not severe, Plaintiff's second argument necessarily fails as it is inseparably linked to her first argument.  Moreover, the ALJ specifically considered all of Plaintiff's complaints as evidenced by her discussion of Plaintiff's complaints concerning her arthritis, hernia, kidney damage, and heart impairments and by her comment that "[n]one of these impairments have been supported by objective signs, symptoms, or laboratory findings and no more than minimally affected her ability to perform work related activities during the period in issue." (Tr. 21) (citing Bowen, 482 U.S. 137 (1987)).

## V.     CONCLUSION

For the foregoing reasons, the undersigned finds the ALJ's decision is supported by substantial evidence and is based upon the proper legal standards.

Accordingly, after due consideration, it is hereby

**RECOMMENDED**:

The Commissioner's decision be **AFFIRMED**.

**DONE AND ORDERED** at Jacksonville, Florida, this __28th__ day of February, 2008.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

16